UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| Gregory Houston,<br>52 G Street, S.W.<br>Washington, DC 20024<br><br>　　　Plaintiff,<br>v.<br><br>PAVILION USA 2020, INC.<br>Serve: 1015 15th Street, N.W., #1000<br>Washington, D.C. 20005<br><br>And<br><br>FREDERICK BUSH<br>Serve: 1200 23rd Street NW, Apt 906<br>Washington, DC 20037<br><br>And<br><br>ALAN M. DUNN,<br><br>Serve: 3338 Reservoir Road, N.W.<br>Washington, DC 20007<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, Gregory Houston, brings this action against Defendants Pavilion USA 2020 Inc. ("Pavilion USA"), Frederick Bush ("Bush"), and Alan M. Dunn ("Dunn") (collectively the "Defendants") for terminating his employment because he tried to prevent the Defendants from committing waste, fraud, and gross mismanagement. His termination violated the National Defense Authorization Act, 41 U.S.C. § 4712, and the public policy of the District of Columbia, as set forth in the Nonprofit Code.

## INTRODUCTION

A World's Fair is held approximately every 5 years. For each World's Fair, to advance United States trade and foreign policy objectives, the United States Department of State (the "State Department") selects and oversees a private entity to organize a pavilion to represent the country. *See* 22 U.S.C. § 2801 (Congressional finding that international expositions are important instruments of national policy). In early 2018, Plaintiff Houston and Defendant Bush, with Defendant Dunn, acting as attorney, prepared to organize a bid on the opportunity to represent the United States at the World's Fair then scheduled to take place in Dubai starting in October 2020. To carry out their venture, two corporations were organized, first Big Things Group, LLC ("BTG") and a 501(c)(3) non-profit Pavilion USA 2020, Inc. (then known as Expo Group 2020, Inc.). Bush became Chairman of the Board of Pavilion USA, Houston became the Chief Executive Officer, and Dunn became the chief legal officer and a Director of the Board.

Over the next year, Bush and Dunn attempted to use and did use Pavilion USA to enrich themselves, prioritizing paying themselves, ignoring State Department requirements, the law against deriving personal benefits from non-profit corporations, organizational policies and advice developed by Pavilion USA's external auditors, and operating without candor towards vendors and sponsors. Bush and Dunn misled the rest of the Board, undermined internal controls and brought Pavilion USA into potential violations of the Internal Revenue Code. Pavilion's Chief Financial Officer ("CFO") became so concerned that he prepared a whistleblower complaint that identified this misconduct, and then quit, describing his resignation as forced. When Mr. Houston tried to support the CFO's position and get the Board of Directors to address the same concerns, Bush and Dunn first tried to enlist Mr. Houston's support in downplaying and covering up, and then tried to persuade the rest of the Board of Directors to fire Houston. When

2

the other directors did not agree, Bush and Dunn provoked their resignations, giving them a majority of the seats remaining occupied, and then fired Houston.

## PARTIES

1. Gregory Houston ("Houston" or "Plaintiff"), a resident of Washington, DC, was the Chief Executive Officer of Pavilion USA 2020, Inc. ("Pavilion USA") from April 6, 2018 to February 14, 2019.

2. Defendant Pavilion USA was a nonprofit corporation incorporated under the laws of the District of Columbia in April 2018, which was exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986. Pavilion USA dissolved in August 2019.

3. Defendant Frederick Bush ("Bush") was a founding director of Pavilion USA. Bush was Chairman of the Pavilion USA Board from its inception in April 2018 until he resigned in or about May 2019. Bush also entered into a compensation agreement with Pavilion USA to be paid as an independent contractor for his fundraising services. In both roles, director and independent contractor, Bush was involved with soliciting and submitting the federal bid to the US State Department, developing and implementing most of Pavilion USA's major operating policies, and he directed and controlled the retaliatory firing of the Plaintiff, as set forth in this Complaint. Bush regularly conducts business in Washington, DC, and his conduct implicated in this lawsuit occurred during his work for Pavilion USA at its offices in Washington, DC.

4. Defendant Alan M. Dunn ("Dunn") was also a founding director of Pavilion USA. Dunn served as Board member until Pavilion's dissolution in August 2019. Throughout this period, Dunn directed and controlled the retaliatory firing of the Plaintiff, as set forth in this

Complaint. Dunn regularly conducts business in Washington, DC, and his conduct implicated in this lawsuit occurred during his work for Pavilion USA in Washington, DC and elsewhere.

## JURISDICTION

5. This Court has subject matter jurisdiction over this matter under 28 U.S.C. 1331 and supplemental jurisdiction under 28 U.S.C. 1367.

6. This Court has personal jurisdiction over defendant Pavilion USA under D.C. Code § 13-422.

7. This Court has personal jurisdiction over Defendants Bush and Dunn under D.C. Code § 13-422 and § 13-423.

## FACTS

**A. The organization, the bid, and the selection.**

8. On February 16, 2018, the State Department publicly announced a Request for Proposals ("RFP") seeking an implementing partner to organize, raise funds for, design, construct, oversee operations of, and disassemble the entirety of the U.S. government's participation in World Expo in Dubai, United Arab Emirates ("UAE"). 83 FR 7098.

9. According to the RFP, once the selected implementing partner raised sufficient seed funding, State would sign a binding Memorandum of Agreement, allowing the selected entity to initiate formal building construction, and enter into negotiations for a participation contract with Expo 2020.

10. The RFP required applicants to operate in a transparent and financially responsible manner.

11. Houston and Bush decided to work together to try to win the RFP and operate the U.S. Pavilion at the 2020 World Expo. With legal services provided by Dunn, Big Things Group,

4

LLC ("BTG") was incorporated on March 9, 2018 in Delaware to bid on the United States Pavilion for the World Expo in Dubai and to bid on providing similar services for other nations.

12. The bid was prepared with several subject matter experts that Bush and Houston assembled, including Thomas Downing ("Downing"), an independent expert in international financial management. Downing had a well-deserved reputation within the State Department for his work in anticorruption efforts and long track-record managing complex State Department programs.

13. Leading into Expo 2020 Dubai, the State Department made rigorous financial and operational controls a high priority – second only to demonstrated fundraising capacity. The State Department made these priorities because the entity overseeing the previous U.S. Pavilion, at Milan in 2015, filed for bankruptcy at the conclusion of the World's Fair, leaving more than $27 million in unpaid debt and causing major embarrassment to the United States.

14. In its bid, BTG promised that it would have transparent finance and operational policies and systems that would meet or exceed State Department contracting standards to protect the investments of donors, the interests of vendors, and the reputation of the United States.

15. The bid designated Bush to be the Chief Executive Officer of Pavilion USA, Dunn to be the External Counsel, and Houston to be the Deputy Chief Executive Officer. To create and implement rigorous financial and operational controls, Houston recruited Downing to serve as Chief Financial Officer ("CFO") of Pavilion USA.

16. In its bid, BTG identified a 10 member collaborative consortium of businesses and organizations to fulfill the requirements of the RFP.

17. Houston expended tens of thousands of dollars during the bid development stage, for which he was never reimbursed.

18. The RFP required use of a 501(c)(3) as the primary vehicle for the operation of the public-private partnership. Expo Group 2020 was incorporated on April 6, 2018 and promptly applied to the IRS for 501(c)(3) status. The non-profit organization, Expo Group 2020, was renamed Pavilion USA 2020, Inc. on June 26, 2018 at the request of the State Department.

19. On May 30, 2018, the State Department issued a letter of intent ("LOI"), selecting BTG as the successful bidder for the right to represent the United States at the Dubai Expo. The LOI required BTG/Pavilion to follow vendor and donor vetting requirements, conditions identified in the RFP, and the Foreign Affairs Manual ("FAM").

20. After the bid was successful, Bush stated that, for personal financial reasons, he wanted to be an independent contractor, not an employee of Pavilion USA. He was tentatively classified as an independent contractor, pending the advice of Pavilion USA's outside accounting and audit firm. Houston became the President and Chief Executive Officer of Pavilion and Bush became Chairman of the Board. Houston was then designated Pavilion USA's "key employee", at which time State designated Houston as its official and only non-governmental representative to the UAE Government's Oversight Authority for Expo 2020 Dubai.

21. Plaintiff Houston believed that State and BTG had formed a contract, the terms of which were set out in the RFP, the bid, and the LOI.

**B.  Houston makes and supports whistleblower disclosures.**

22. During 2018, the first year of operation of Pavilion USA, Houston and Downing, the CEO and CFO, became concerned that Dunn and Bush were mismanaging the organization, to their own benefit. Houston repeatedly sent memos to Bush documenting additional, escalating

6

concerns he and Downing held and noting the increasing likelihood that this behavior would cause Downing to leave the organization.

23. On January 16, 2019, Downing announced that he was resigning in protest over Dunn and Bush's conduct and pressure they had put on him. Upon announcing his departure, Downing wrote to the Board, "The reasons for my resignation are reflected in two reports: the monthly financial report for December 2018, distributed to you earlier today; and a report on certain contracts and services agreements, sent to Fred [Bush] and Greg [Houston] earlier today." Downing stated that he was providing his final reports as a whistleblower.

24. The CFO reported to Houston that Bush and Dunn had taken and were taking a series of actions to undermine internal controls and enrich themselves with charitable funds at the expense of the organization. These actions amounted to gross mismanagement, abuse of authority and violation of laws, rules, and regulations. Among other concerns, the CFO's report 0set out the issues described in Paragraphs 25 to 30, below.

25. For many months, Dunn acted as legal counsel to Pavilion USA without disclosing his rates or providing any formal letter of engagement. Finally, on November 7, 2018, Dunn sent a draft agreement describing the terms under which he would (and already had) serve (and had served) as external legal counsel to Pavilion USA. The engagement letter Dunn drafted for himself included: (a) a requirement that Pavilion USA pay Dunn his flat fee in full on the 1st day of each month with a 25% late-fee effective on the 2nd day of each month; (b) a 60% increase in monthly legal fees without any justification or determination of reasonableness for the increase; (c) payment for bid-preparation fees which was doubled as a "risk fee"; and (d) a 25% interest charge for services rendered during Pavilion's startup period. Dunn, who reviewed

all of Pavilion's vendor contracts, knew that no other vendor enjoyed such terms. Pavilion USA did not sign Dunn's engagement letter.

26. After receiving the draft engagement letter, the CFO looked more closely at the relationship and learned that Dunn's license to practice law in the District of Columbia had been suspended during some or the time Dunn served as counsel to Pavilion USA, including at the time Dunn submitted his proposed engagement letter. Dunn did not notify Pavilion USA of this suspension.

27. Pavilion USA engaged a registered lobbyist, ostensibly to organize American business support in the Middle East for the U.S. exhibition. Without separate compensation, Bush sought to use the services of the same consultant, at the expense of Pavilion USA, to have the President of the United States appoint him to the rank of "Ambassador" to the World's Fair. When Houston and Downing raised alarm over the nature of the personal services and insisted that Pavilion USA document and register all lobbying done on Bush's or Pavilion USA's behalf as was required by federal lobbying law, Mr. Bush had the consultant's invoices back-dated and written to intentionally omit the full scope of services provided. Defendant Dunn provided a verbal opinion on December 17, 2018 to justify Bush receiving personal "favors," from the consultant, for free, as they were unrelated to the "business development" purposes of the consultant's newly drafted contract by Dunn.

28. Bush and Dunn had a personal relationship that predated their work on Pavilion USA. In drafting Bush's contract to serve as an outside fundraising consultant, Dunn wrote that Bush's agreement could not be terminated without cause during any "Project Assignment." The one Project Assignment in the agreement was the World's Fair and the proposed end date was almost three years away, September 30, 2021. Thus, Dunn wrote a contract so that Bush, and

only Bush, could not be terminated without cause. At the same time, Dunn drafted a contract between Pavilion USA and Mr. Houston that allowed for termination at will.

29.     On December 21, 2018, Pavilion USA received a $1.5 million wire-transfer from a large sponsor to fulfill a portion of the sponsor's commitment. The federal grant of authority made release of the funds contingent on final review and approval of the deal's terms and contract by the State Department. Dunn emphatically told Houston and Downing that he should be paid these funds and that the State Department had approved the transaction.  In fact, the State Department had not approved the agreement with the sponsor -- the State Department had asked Dunn to revise certain terms.

30.     Due to concerns that Bush should be an employee, not a contractor, and that Dunn was operating without a signed letter of engagement, Mr. Houston instructed the CFO to issue their payments as advances pending further review early in 2019. Bush and Dunn were then notified by email on December 26, 2018 explaining why the payments to them were advances and subject to recapture or amendment. The Independent Director who was Chair of Pavilion's compensation committee was informed of these restrictions.

31.     Following Downing's resignation, Mr. Houston informed Mr. Bush that due to Mr. Downing's position as a whistleblower as well as Mr. Houston's own fiduciary obligations, he intended to retain outside legal counsel to review Downing's reports and provide an opinion for the full Board and the State Department as was required under the commitments of the bid and in compliance with 41 U.S.C. § 4712(a)(2)(G).

32.     Houston formally notified Bush in writing of his intent to suspend Dunn from providing day-to-day legal services pending consultation with the Independent Directors and the external counsel he hoped to appoint.

### C. Bush and Dunn fired Houston for making and supporting whistleblower disclosures

33.     Neither Houston nor the CFO was ever a Board member. Bush was the Chairman of the Board and he and Dunn were both original members of the Board. Pursuant to Treasury regulations and written guidance provided by Pavilion USA's external tax and financial advisors, other directors ("Independent Directors") were recruited to outnumber the directors who had an ongoing financial interest in the activities of Pavilion USA, such as Bush and Dunn.

34.     After the CFO announced his resignation, Bush instructed Houston not to suspend Dunn and not to hire special outside counsel. Instead, Bush required Houston to confer with Dunn concerning the CFO's whistleblowing reports prior to showing them to the Independent Directors – even though the whistleblowing reports disclosed actions taken by Dunn.

35.     Confronted with Downing's allegations, Dunn acknowledged that they concerned his actions but implored Bush and Houston, "let's work together gentlemen, otherwise this will surely be a debacle."

36.     Dunn then threatened Houston by stating "having an unpleasant Board meeting that results in either your resignation or a distemper in the Board - some sort of destabilization of our Board - is deeply undesirable at this fragile early moment in the Company's evolution."  The CFO's his reports themselves did not suggest any reason Houston should resign. Dunn's threat that the Board meeting would result in Houston's resignation was directly tied to Houston supporting a thorough investigation of the issues the CFO had raised.

37.     Mr. Houston brought the CFO's concerns with the activities of Defendants Bush and Dunn to the attention of Independent Directors who chaired the Compensation and Procurement Committees and other Independent Directors. He also requested review by

independent outside counsel. He informed Mr. Bush he would not approve his 1099 tax status without a final letter from the accounting firm serving as external tax and financial advisors.

38. Defendants Bush and Dunn finally distributed the CFO's reports to the full Board on January 21, 2019. They sent an altered version assembled without input or discussion with Mr. Houston. They informed the other Directors that this version could not be shared or even discussed with Mr. Houston because doing so would waive the attorney-client privilege – even though Houston was the CEO of Dunn's client, Pavilion USA.

39. On or about that same day and despite both Mr. Bush and Mr. Dunn having raised no concerns or objections regarding Mr. Houston's leadership during Houston's contract renewal just 18 working-days earlier, Mr. Dunn began circulating to the Board what Dunn and Bush believed to be negative information about Mr. Houston and Houston's performance, cloaked again under attorney-client privilege.

40. On February 4, 2019, knowing that Mr. Houston was in the Middle East on business, Bush called a Board of Directors meeting. He did not invite or notify Houston, who had attended all past meetings as a non-voting participant. At the meeting, Bush and Dunn introduced a resolution to terminate Houston's employment. Bush and Dunn told the other members of the Board Directors not to tell Houston that they had met. Dunn told the Independent Directors they would be "held responsible" if they disclosed anything to Houston.

41. The Board did not approve the resolution Bush and Dunn proposed, citing lack of grounds for terminating Houston.

42. Several Independent Directors informed Houston of the outcome of the meeting and said they believed that Bush and Dunn were pursuing a highly personal agenda that ran counter to the interests of the organization and demanded Mr. Dunn and Mr. Bush cease their

efforts to remove Houston. The Independent Directors then called for a meeting of the Board to include Houston and mediate a solution in the best interest of the organization. Mr. Bush scheduled this meeting for February 13, 2019.

43. Despite agreeing to this meeting, Mr. Bush scheduled meetings with consortium members for the day after the emergency meeting, with cryptic assurances such as "we'll have news to share" and "everything will be clear by then." Concurrently, Mr. Bush secured the commitment of a long-term personal friend, Joseph Lufkin, to replace Mr. Houston as CEO.

44. After learning of the CFO's departure, the State Department requested a meeting with Pavilion's Board on governance concerns and fundraising failures. Bush delayed this meeting until after the emergency meeting he had scheduled concerning Mr. Houston.

45. On February 7, 2019, the State Department wrote Pavilion's Board: "My office has been working with Chairman Bush for a few weeks to schedule a meeting with your team to review the health of the project. The State Department understands the complexity of assembling a group of busy people. We regret that yesterday (February 6) was ultimately not possible, but understand that February 14 or February 15 have been proposed by [Pavilion USA]. We hope for sooner rather than later, and have flexibility to accommodate schedules."

46. On February 12, 2019, Dunn ordered Houston, in writing, to cease all communications with external partners, vendors, and the State Department until after the emergency meeting, concluding "The board is still considering an arrangement with you and any communications that you have with outside parties will adversely affect that arrangement."

47. When the time for the February 13, 2019 meeting arrived, and the Independent Directors were present, Bush refused to call the meeting to order, which meant minutes would not have to be taken.

48. Although two Board Directors had already resigned between Mr. Bush's initial call to terminate Mr. Houston on January 25 and the February 13, 2019 Board meeting, the remaining Independent Directors initially stood firm against the contrived removal of Mr. Houston. Defendants Bush and Dunn nevertheless continued their pursuit of terminating Houston.

49. When Bush again proposed firing Houston, two of the three remaining Independent Directors resigned in protest. The only remaining Independent Director, although a longtime family friend of Mr. Bush and an employer of Mr. Bush's son, stated that he was considering resigning as well, but Bush and Dunn asked him to remain on the Board. The now-three-member Board terminated Houston.

50. For the last six months of its existence, Pavilion USA did not have an independent board.

51. After terminating Houston, Bush and Dunn continued to run the organization, without an independent Board. Under their "stewardship," during the remaining months of its life, Pavilion paid out more than $550,000 to Bush, Dunn and their allies before dissolving. At the same time, Pavilion USA delayed and underpaid contractual payments to non-insiders and was carrying invoices for work already performed by such architects, engineers and designers amounting to over $1 million, well in excess of its remaining funds.

52. After firing Mr. Houston, Defendants Bush and Dunn sought to further damage his reputation. For example, Bush and Dunn first failed to inform the State Department that Independent Directors had resigned over the effort to push out Houston, then claimed that Houston's performance and conduct had caused the director's resignation, late payment to

Consortium members, and his own termination, and then falsely asserted that he had failed to pay the organization's corporate taxes and modified its insurance policies to his own benefit.

53. Bush and Dunn and their proxies made these claims to senior members of the US State Department and the Pavilion USA consortium – which included long-time professional relations and contacts of Mr. Houston, leaders of the US and UAE business and Expo community with whom Mr. Houston had continuing interests, and the wider professional community in which Mr. Houston operates and depends on for his livelihood.

**D. Exhaustion of Remedies.**

54. On July 20, 2021, Mr. Houston filed a complaint with the Inspector General of the State Department under 41 U.S.C. § 4712.

55. This District Court complaint is timely filed. Mr. Houston was terminated on February 14, 2019.

**COUNT I**
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
**AGAINST PAVILION, BUSH, AND DUNN**

56. Plaintiff incorporates as though restated each of the allegations set forth in the paragraphs above, and further states as follows.

57. The Nonprofit Code of the District of Columbia sets out a clear public mandate that directors and officers of a non-profit corporation shall operate for a public purpose, not for the personal gain of their officers or directors. D.C. Code § 29-402.06(b).

58. Defendants Dunn and Bush operated Pavilion USA for their own personal gain.

59. The Internal Revenue Code requires employers to correctly classify their employees and any independent contractors, so that payroll taxes will be paid for employees.

60. The services Bush provided to Pavilion USA were a key aspect of its regular business.

61. Despite clear advise from Pavilion USA's external tax and financial advisors, Bush and Dunn insisted that Bush be paid as an independent contractor, without withholding taxes.

62. District of Columbia Bar Association Rule of Professional Conduct 1.5(b) requires an attorney to disclose the basis for their fees either before or within a reasonable time after commencing a representation.

63. Defendant Dunn began advising Plaintiff Houston and Defendant Bush in February 2018, and representing Pavilion USA 2020 in April 2018 but repeatedly changed his fee arrangement, in his own favor, through 2018.

64. District of Columbia Bar Association Rule of Professional Conduct 1.7 requires an attorney to disclose and obtain consent in any representation in which their personal and professional relationships are or could be in conflict with the client's interests.

65. Defendant Dunn had a personal relationship with Bush. Dunn used his role as attorney for Pavilion USA to provide Bush with independent contractor status, favorable contract terms for his own services, and free services to support his desire to be made an Ambassador.

66. District Columbia Court of Appeals Rule 49(a) provides that no person may engage in the practice of law in the District of Columbia or in any manner hold out as authorized or competent to practice law in the District of Columbia unless enrolled as an active member of the D.C. Bar.

67. Defendant Dunn held himself out to Pavilion USA, Houston, and CFO Downing as if he were an active member of the D.C. Bar when he was not.

68. By reporting to the Independent Directors and the State Department, Plaintiff tried to stop Defendants from committing the violations of the Nonprofit Code, the Internal Revenue Code, the Rules of Professional Conduct, and the Rules of the Court of Appeals, as described in Paragraphs 57 - 67 above.

69. Recognizing that Defendants Bush and Dunn used wrongful means to profit from Pavilion USA, the Attorney General for the District of Columbia has filed *District of Columbia v. Pavilion USA 2020, Inc., Frederick Bush, and Alan Dunn*, Civ. Act. No. 2021 CA 001855 B (D.C. Superior Court), which is pending at this time.

70. Bush and Dunn, using Pavilion USA as their instrument, orchestrated the termination of Houston in retaliation for his reporting and attempting to stop their actions.

71. As a result of the actions of Defendants, Houston suffered economic injury from loss of salary and benefits that he was earning as Chief Executive Officer of Pavilion.

72. As a result of the actions of Defendants, Houston suffered damage to his professional reputation, costing him opportunities in his field.

73. Defendants' termination of Houston violated public policy.

74. Defendants' termination of Plaintiff was willful, wanton and malicious.

## COUNT II
## WRONGFUL TERMINATION IN VIOLATION OF 41 U.S.C. 4712
## AGAINST PAVILION, BUSH, AND DUNN

75. Plaintiff incorporates as though restated each of the allegations set forth in the paragraphs above, and further states as follows.

76. Pavilion USA was authorized to conduct business for and on behalf of the United States, with the authority of its actions derived from the State Department's Letter of Intent.

Pavilion USA was a federal contractor within the meaning of 41 U.S.C. §4712, and is bound by the whistleblower obligations and protections therein.

77. When the State Department issued the Letter of Intent, it notified Pavilion USA that its operations and finances were subject to review at any time by the State Department Inspector General. Houston was directed to report any actual or suspected violations or concerns about Pavilion USA's operations to the State Department's designated leadership team upon discovery of those concerns, which Houston did.

78. As Chief Executive Officer, Mr. Houston had an obligation to report and in fact did report misconduct, including waste and fraud, as well as abuse of authority under 41 U.S.C. §4712(a)(1) and 41 USC §4712 (a)(2)(D) & (2)(G) to the State Department and to the Board of Directors of Pavilion USA. *See also* D.C. Code §29–406.42.

79. To further their own interests, the Defendants hid, downplayed, and failed to take seriously these whistleblower complaints.

80. In communications with the Independent Directors, the State Department, and consortium members, Mr. Bush expressed a belief that Mr. Houston was "scheming" and "conspiring" against Bush with the appointed State Department oversight team.

81. Pavilion, Bush, and Dunn thus retaliated against Houston by terminating him and damaging his business reputation.

## COUNT III
**(Tortious Interference with Contract and Prospective Advantage Against Defendants Bush and Dunn)**

82. Plaintiff incorporates as though restated each of the allegations set forth in the paragraphs above, and further states as follows.

83. On December 14, 2018, Plaintiff signed a contract with Pavilion USA, confirming the terms of his employment.

84. Plaintiff had an opportunity to earn additional compensation, beyond the amounts identified in his contract, if Pavilion met fundraising targets.

85. Defendants Bush and Dunn not only knew of the contract -- they had participated in its negotiation and they were members of the Board that approved it.

86. Defendants Bush and Dunn interfered with the contractual relationship between Plaintiff and Pavilion USA. To cause Plaintiff Houston's removal, Defendants Bush and Dunn provided misinformation to their fellow Board members, manipulated the Board meeting process, and put their own interests ahead of the organization.

87. As a direct and proximate result of this third-party interference by Defendants Bush and Dunn, acting outside their authority and for an improper purpose, Mr. Houston was damaged by a loss of the contract, contract expectancy, and personal and business reputation. Due to the improper conduct of Mr. Dunn and Mr. Bush, Houston has been damaged and seeks compensatory damages for lost income, diminished earning capacity, damage to reputation, and other harm.

88. Defendants Bush and Dunn's conduct toward Mr. Houston was intentional, reckless, vindictive, and fraudulent, and entitles Mr. Houston to additional punitive damages.

**DEMAND FOR A JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that the Court award him the following relief:

A. Back pay and lost benefits.

B. Compensatory damages in an amount to be determined by a jury.

C. Punitive damages in an amount to be determined by a jury.

D. Reasonable costs and experts' and attorneys' fees;

E. Any other such relief that the Court may deem just and equitable.

                Respectfully submitted,

/s/
_____
David Wachtel, D.C. Bar # 427890
Trister, Ross, Schadler & Gold, PLLC
1666 Connecticut Avenue, N.W., 5th Floor
Washington, DC 20009
(202) 839-4486
dwachtel@tristerross.com

Attorney for Plaintiff Gregory Houston